And this case is Kalshiex, I may have mispronounced that, versus Flaherty, number 25-1922. So we'll hear from Appellant's counsel, and you may proceed. Thank you, Your Honor. Stephen Ehrlich on behalf of Appellants. I'd like to reserve three minutes for rebuttal. That'll be granted. Thank you. How do you pronounce your client's name here? For Appellant's, we're from the State Counsel. Oh, shoot. So sorry. Yes, yes, yes. You must know by now how the other side pronounces their name. I actually don't. I thought it was Kalshie. Kalshiex. The Kalshie? Kalshiex. All right, good. Okay, good. Sorry. Kalshiex, right? All right. Do you go with just Kalshie, or do you go with the whole thing with the X at the end? Kalshiex. All right, we'll do. Thank you. Great. Easier to say. All right, we'll do. Thank you. I'm so sorry. You may proceed. Thank you, Your Honor. For three independently sufficient reasons, any one of which is enough to rule for the state, this court should reverse the decision below. First, what Kalshie offers is not a swap, so it falls outside the Commodity Exchange Act in the first place. Second, there can't be preemption here because Congress specifically declined to preempt the type of state gambling laws at issue here while preempting others, and Congress has time and again affirmed the state's regulation of gambling within their borders, a choice that the Supreme Court's decision in Wyeth makes clear is incompatible with preemption. And third, the standard preemption analysis express field and conflict also do not get Kalshie to preemption. For any or all of those reasons, this court should reverse. I'd like to start with the Commodity Exchange Act's definition of swaps. And quite simply, Your Honor, Congress did not intend a massive sea change in gambling regulation when it inserted the word swap into the Commodities Exchange Act in 2010 as part of the Dodd-Frank reforms. The reason this is such a massive sea change is because swaps have to be traded on CFTC regulated exchanges on a designated contract market, and it's in fact a federal crime to trade them outside of those scenarios. And so what we have here is a definition by Kalshie that would essentially make all casinos and sportsbooks currently federal felons. We think that's certainly not what Congress was trying to do. We don't think that's what the Supreme Court in Murphy was envisioning when they struck down PASPA and said, we're leaving this for the states to regulate. They didn't mean we're leaving it to the CFTC, and that was only seven years ago. They expected this to be something that the states regulate. And I think what the part of the issue is. Let's jump into this now. Because we don't have all that much time. So it seems that the definition of swaps is actually quite broad. And I understand you point out some things that seem undesirable to your side. But for instance, I noticed in your brief, I don't know if it's a suggestion or a limitation, but you suggest something should be inherently financial, economic, whatever. But that's not in the statute. Are we obliged to apply what the elected branches have gotten us here? And to the extent any fix is necessary, and we're not saying it is, isn't that for the elected branches to deal with and not us? Yeah. So I think a few responses to that, Your Honor. I think we are both looking at the text. So on our side, we're looking at the words especially associated with. And so associated with, joined, are connected to. We give the example in our brief, you know, lung cancer is associated with. Well, it's not only that. It's associated with a potential financial, economic, or commercial consequence. I mean, that's pretty broad. Yeah, I agree. It's broad. And it's because Congress was trying to sweep in various things as part of the Dodd-Frank reforms. They couldn't foresee exactly what would become a swap. But it's not unlimited. I think this is similar to the sort of travel. That's true. Maybe they didn't foresee this. It's a very interesting business model, and maybe they didn't foresee it. But again, isn't that for the elected branches to deal with? Well, it is. But I think what they've done here is not what Halchi has said that they've done. And the reason we know that, we have the associated with language, as I pointed out in our example in our brief, lung cancer is associated with smoking. Things can rise and fall together. And we have the context of the statute itself. So the other clauses, the other subclauses, we're focused on subclause two. That's mainly what the party has been arguing about. But the other subclauses are all about a link to a financial instrument or measure. And that's what we would say applies here, too. Something is associated with something when it has a link to the financial instrument or measure. And so we used inherently financial as sort of the shorthand. But that's really- Oh, that's limiting, though. Well, it is limiting. And I think the reason it's limiting is because we have the rare case where three critical statutory interpretation rules cut our way, which is we have a clear statement rule that Congress doesn't lightly change the power between federal and state government. This is something that state governments have regulated forever. And I would point the court to the state's amicus brief from a broad coalition of states who goes in depth on that. We have the major questions doctrine, which is that Congress doesn't lightly give agencies vast economic and political power without a clear statement. And we have the fact that Congress doesn't lightly repeal its own statutes. And Congress has time and time again, every time it passed a federal gambling law, accommodated an accepted state law. And that's what we think they were doing here. They didn't do anything to upend that there. We require a clear statement for Congress to do that. I mean, this would- the Wire Axe Prohibition on interstate gambling wouldn't make any sense if everything was legal through the CFTC. At the time this was enacted in 2010, PASPA was making sports betting largely illegal. That apparently was for nothing. The Supreme Court's decision in Murphy apparently did nothing because everything was legal through the CFTC. So we have those three clear statement rules. Why do you say nothing and everything? I mean, we're talking about transactions only on the DCMs, right? Not all sports gambling. Well, we are, but the problem is with the structure is the Commodity Exchange Act prohibits trading of swaps specifically. We're talking about swaps that the parties are arguing about. Those are not allowed to be traded off DCM. It's a federal crime to be traded outside designated exchange markets. And so as we say in our briefs, they're funneled essentially to the CFTC. So there can't be any- if Calshi is right and their definition, we would say, is limitless. But if they're right about this, then everything that counts as a swap, and in our view is pretty much everything, would have to be regulated by the CFTC. We don't think that's what Congress is doing. We see this in their examples they use. They talk about the Eagles winning the Super Bowl and things like that. But when you look at the article, the reason that generated revenue is because they held a parade and things like that. And same thing with the World Cup, there's greater international appeal. We think that's too attenuated. This is why Congress meant to link it to a financial measurement or instrument. And that's what they were doing here, and that's what the clear statement rules are pointing to. There's no examples of sports betting that are not swaps. Well, we give some examples that could be game- like essentially gaming adjacent that could be swaps and therefore would trigger the special rule. So things around gaming. So the revenue of the Pittsburgh Steelers, for example, we think is linked to a financial measurement, the revenue. And so it would be a swap, would fall into the special rule and up to the CFTC to exclude it. But things about the sports game itself, probably not. We can't envision anything that would be a swap in that scenario. And I think, as I said, the clear statement rules that I was discussing all point that way. And they feed into our preemption arguments as well. We talk about first the presumption against preemption. This is, again, something that states have long regulated. It's within our police powers. We have great controls on all of these things around gambling. It's a strongly regulated environment. And again, we've regulated this for hundreds of years. On top of that, we have the congressional acceptance of state gambling laws in nearly every decade since the 1940s. Congress has repeatedly accepted and incorporated state gambling laws into its statutes. And the Supreme Court tells us in Wyeth, when that happens, when Congress is aware of a state scheme, aware of state laws, and nonetheless does not do anything with it, that's a pretty strong indication that there's no preemption. And that's exactly what we have here. What the Supreme Court also says in Wyeth, by the way, is Congress surely would have enacted an express preemption provision if this is something they wanted to do. And they did that here, but not for the transactions that are at issue in our case, not for sports outcome contracts, and certainly not in a way that would allow the federal government to make all casinos in New Jersey felons. So we have them enacting us an express preemption provisions for certain gaming laws, not the ones at issue here. The Supreme Court tells us in Cipollone that that's a very strong indication that there should be no preemption. And then on top of that, we have the savings clauses that we talk about in our briefs, that they're not divesting federal and state courts of jurisdiction over the usual claims in those courts. And lastly, we have the special rule, which incorporates state law in one of the things that the CFTC looks at when they're excluding things. And so when you pile all of those things on top of each other, especially Congress's explicit preemption of certain things, certain state gaming laws, but not the gaming laws at issue here. And the fact that they've repeatedly accepted state gambling laws, there just cannot possibly be a way where Congress preempted, especially the field, but really any preemption in this area. And then- There's a lot of discussion in the briefs as well about conflict preemption as well. Yes. And we agree, excuse me, Your Honor. We agree that conflict preemption is something that can apply in the appropriate case. And it just doesn't apply here, because federal law is prohibiting the same thing as state law. And in those circumstances, there's almost never going to be conflict preemption. I mean, Calshi itself admits, and we quote this in page 49 of our opening briefs, their D.C. circuit brief, where they say, Congress did not want sports betting to be conducted on derivative markets. We agree. And Congress said that essentially in the special rule. It gave some discretion to the CFTC. The CFTC has an implementing regulation, says the company shall not list. So what they're doing is illegal under federal law. It's illegal under our state law, and there's not going to be a conflict in that circumstance. I will say, they can do what they want, as long as they get a license in New Jersey. That's all they have to do is comply with our New Jersey- Well, but there are other conflicts too. I mean, you have to be over 18 in New Jersey. It can't deal with collegiate betting in any way, and other things too, but go ahead. Certain collegiate games, but yes- It's in the Constitution. Correct. Exactly, Your Honor. And they have to comply with those things for New Jersey residents. But again, this is something that companies deal with all the time, is parallel federal and state regulations. We quote examples at page 52 of our brief, but antitrust laws, security laws, anti-discrimination laws, companies deal with parallel regulations all the time. And we don't see those things that Your Honor pointed out as conflicts here. Again, they shouldn't be trading these on DCMs at all, and so the fact that they're allowed to do it subject to some restrictions under our law doesn't create a conflict here. And so for that reason, we would say there's certainly no conflict. I think the parties agree that conflict preemption could apply. I think a lot of the arguments revolve around field preemption. It's just that in this case, in the sports gambling case, where Congress has repeatedly- What is the field anyway, if it's field preemption? Sorry, Your Honor. What is the field? Well, I think you'd have to ask Calhie that. I mean, we don't think there is a field. I think they would say all trading on designated contract markets, which is, I think we would say clearly not true. I think the Seventh Circuit in the American Agriculture case, that both parties cite, says not field preemption. So I don't know the answer to that, but that's why we say there's no field preemption. All right. Do you have anything, Judge Porter? Well, just given the posture of the case on the preliminary injunction on the first prong, you know, they don't have to show that they're likely to win, right? Just that they have a significantly better than negligible argument. Are you saying that the position is not significantly better than negligible? Well, I guess I would say two things. I don't think we think that's the standard, and we quote a contrary case in our briefs for likelihood of success, but I also don't think it matters. I mean, it's a pure question of law in our view here, which would be de novo regardless. And on a de novo review, the idea that Congress inserted swaps to put all gambling, make all casinos felons, and then preempted all state law would just not work for all the reasons that we've been talking about. And so I think under any standard that you would apply, it just wouldn't meet it. Great. Judge Roth, do you have anything else? I have nothing further. Thank you. Okay, great. Thank you. Thank you, Your Honor. We'll get you on rebuttal. And we'll hear from the appellee now. You may proceed. Good morning, Your Honors. May it please the Court. We'll have him in on behalf of Kelshey. The district court correctly held that Congress's decision to vest the CFTC with, remember the statutory language, exclusive jurisdiction over trading on designated contract markets clearly preempts defendant's efforts to regulate trading on Kelshey, which is a designated contract market. We think this case can begin and end for some of the reasons I think both Judge Porter and Chief Judge Shigaris, you're noting with opposing counsel, can begin and end with the plain and statutory text, and if I may begin where my colleague began, which is on the definition of swap. I understand his real argument to be swaps have to be traded on exchange, and because they have to be traded on exchange, everything's a felony under Kelshey's view. And I want to be very clear, that is not our position, and that is not what we believe the statute requires, for reasons that defendants themselves point out in their brief. What Section 2A of the Commodity Exchange Act does, is it provides exclusive jurisdiction to the CFTC over on-exchange transactions, and then it has a savings clause, the savings clause that my colleague referred to, that says, except as here and above provided by the grant of exclusive jurisdiction over on-exchange trading, the language that Congress used is nothing contained in this section shall supersede or limit the jurisdiction of regulatory authorities under the laws of any state, or restrict state authorities from carrying out their duties and responsibilities in accordance with such laws. So that savings clause makes clear that nothing else in Section 2, which includes the requirements they referred to, that swaps have to be traded on exchange, limits states from subjecting sports books or gambling casinos, or I'm not sure exactly what the scope of their argument is, but nothing about the rest of Section 2 limits states from subjecting sports books to their own state authority. And Chief Judge Chigaris, as you noted, they made the argument that, well, these don't fall within the statutory definition of a swap, and as you noted, the definition that Congress used in Dodd-Frank is quite broad. It is any event associated with potential financial, economic, or commercial consequences. I want to ask you a question similar to what I asked your friend. What kinds of sports betting are available off the designated, outside the designated contract market? Sports bets offered by sports books in New Jersey and around the country are permissible under, they are regulated by state law, and if they do not occur on DCMs, they may be regulated under state law. That we think is the clear import of the CEA and the Dodd-Frank amendments, and that is certainly our position here. So the parade of horribles about every, you know, casino or every sports book being a felon, if the district court's injunction is affirmed, just simply does not obtain. Now, they, I think, I want to emphasize what I understand to be the breadth of defendants' arguments here, because of course, you know, the context in which we are here is with respect to sports event contracts, but the argument that they make in their brief is quite a bit broader than that. Their view is that they get to regulate anything they deem to be gaming, even if, or gambling, even if it happens on a designated contract market. And let's just look to how New Jersey defines gambling. New Jersey defines gambling to mean staking or risking something of value upon the outcome of a future contingent event. So if they are right, that they can regulate anything they understand to be gaming, even if it happens on a DCM, even if it happens on a federally regulated, subject to the exclusive jurisdiction of the CFTC, then that certainly means they can regulate every event contract, contrary to the clear intent of Congress and Dodd-Frank to put event contracts within the jurisdiction of the CFTC. And it may well mean they could regulate every futures contract, because of course, futures can be understood to be placing a thing of value on a future event. The rise of price in gold, the rise in price in an underlying commodity. And if that sounds familiar to the court, it's because states tried to do this. They tried to do this between 100 and 150 years ago, when many states developed their gambling statutes specifically to target futures trading, which they understood to be gambling. And we cite an important case from the Illinois Supreme Court in our brief, where the Illinois Supreme Court says, you know, dealing in futures to be settled according to the fluctuations in the market is void, for contrary to public policy, it is a crime. This species of gambling has become emphatically and preeminently the national sin. That's how the Supreme Court of Illinois understood futures trading in 1888. And so it is absolutely not correct, as defendants say, to say that Congress wouldn't have had in mind when it granted exclusive jurisdiction to the CFTC over futures trading, after experimenting with decades of concurrent state and federal regulation, after holding hearings, after hearing from witnesses, after revising the prior version of the statute to grant exclusive jurisdiction to the CFTC, after one senator noted on the floor that allowing states to regulate this themselves would lead to total chaos. They absolutely would have had in mind, would have been front and center in Congress's mind, that one of the things that they were doing when they granted the CFTC jurisdiction was preempting state law in the narrow application of trading on DCAs. In the brief, you invoked field preemption and conflict preemption. What's the scope of the field that you're arguing? The field that Congress has preempted is the field of regulating trading on federally designated contract markets. And we think that that's actually, although the Seventh Circuit couched its decision in conflict preemption terms, I mean, we cite a case that says, you know, these categories are not rigidly distinct. We understand the Seventh Circuit case. So you've argued alternatively. Which do you think is the appropriate, more appropriate analysis? Conflict or field? We certainly think both. But, you know, the district court ruled on field preemption. We think that's absolutely right. We think that the court can affirm on that basis. And we just think that if there's any doubt on that question, if there's any doubt about, you know, the nature of the field or anything else, if you look to conflict preemption, it's equally clear. For the reason that the Seventh Circuit, again, noted in the American agriculture case, what the Seventh Circuit said is the state law that would directly affect trading on or the operation of a futures market is preempted. So whether you think about that in terms of conflict preemption or whether you think about it in terms of field preemption, we think that you sort of get to the same result. And there are a bunch of specific respects in which we think that there is a conflict that we'd be happy to go into. Just specifically, I think that my colleague noted at the end of his argument that all Cal-SHE needs to do is get a license in New Jersey. I want to be very clear that it would be impossible for Cal-SHE to get a license in New Jersey because one of the things that New Jersey requires for people to get a license is to accept what they call bets. So if we're in a world where we're subject to state regulation, if we're offering bets, then we have to accept bets only from people in the state of New Jersey. And how is a nationwide exchange subject to impartial access requirements imposed by the CFTC upon which our CFTC designation depends? How could we accept bets only from people within New Jersey? And again, it's not just New Jersey. So if New Jersey is right about whether their state licensing regime can apply here, then you have 49 other states in the District of Columbia that can impose overlapping, conflicting, redundant requirements on a DCM. And if you look to what Congress did in 1974, this is exactly the results that Congress wanted to avoid when it subjected these exchanges to the exclusive jurisdiction of the CFTC. The chaos that Congress wanted to avoid when it created the exclusive jurisdiction provision and created the CFTC. What are some kinds of sports betting that would not fall within your definition of swap? I think that there are probably certain player props that would not have, you know, sufficient economic consequences to fit within the definition. Like if Judge Porter challenged me to ping pong, which he would destroy me, but you could vote, but the clerks might be interested in voting on that one. Go with him. He'd beat me. Yeah, I think, Your Honor, if it's a game between two people without extrinsic consequences, so it may be very consequential to you both, but not sort of financial extrinsic consequences in the world, then I think they sort of say, well, a raffle or a bet on a Little League game or the like, and nothing of the sort would be swapped. Well, it does have to impact economics, right? Right. Okay, so that wouldn't. I mean, you pointed out the Super Bowl, all right? That's going to have the Eagles win the Super Bowl or the Steelers, for that matter, you know, and then that's going to impact folks economically, but just how granular do you need to get? I mean, I've seen the website and, you know, there's a lot of really very specific things. Yeah, so I think that Congress, as you noted, Chief Judge, used a broad definition, but that definition does not encompass everything. It still has to have potential financial consequences. I'm sure that there is a de minimis, you know, respect in which it may, even if you put money on a bet or something like that, that's not what Congress has in mind. It also has to be outside of the control of the parties, so that's another limitation, and then there's a whole list of exclusions from that definition, and then they give the CFTC authority to create further exclusions, which the CFTC has done, and it has done in a way, by the way, that probably, even if you thought we were in a world where the CFTC has authority over off-exchange transactions, they probably exempted all of this stuff anyway. But the key statutory sort of distinction that Congress has drawn since 1974 is if it's on exchange, it's subject to the CFTC's jurisdiction. If it's off-exchange, states can regulate it, and that is a sensible result, we think, and it is certainly, you know, they invoke the absurdity canon, it's certainly nothing like the sort of evidence that they would have to show to overcome the clear statutory text. And the one final point on that that I would just make is if the court harbors any doubt about this, I mean, there are a number of other sort of things that you can look to to dispel that doubt, and one is the special rule itself. The special rule, which is how Congress wanted the CFTC to address certain kinds of event contracts that Congress recognized, you know, deserve closer scrutiny, is to have the CFTC subject those contracts to review, and to give the CFTC the authority to make a public interest call with respect to those contracts, and right there in the text of the special rule is gaming. So even if, you know, they certainly can't point to anything in the statute that would allow them to sort of atextually exclude gaming contracts, and the opposite is true. Yeah, I'm good. Back to field preemption, and let me talk about that just for a minute. It seems that you agree with your friends on the other side that the CEA does not preempt some state common law fraud claims. I'm just wondering, how then can field preemption occur? Maybe I have it wrong. Doesn't Congress have to have left no room at all for state regulation? So that the key, Your Honor, is in how to define the preempted field. So because the field that is preempted is not all derivatives transactions or not everything that touches a derivatives transaction, the field is instead the regulation of trading on a DCM, and I think that what courts immediately recognized, and there were subsequent amendments to the CEA that codified that recognition, is that when you are applying a state law fraud claim to fraud that happens to happen on a DCM, then you're not really regulating futures trading on a DCM, you're regulating fraud that happens to happen there. It's not a direct regulation, and that's how courts interpreted the CEA right from the beginning, right from 1974 when it added the exclusive jurisdiction provision, and then Congress codified that in subsequent amendments to the CEA, like where it provided certain authority to states, including the authority, of course, to bring state common law claims under their fraud laws when it enacted Section 16 in 1983, which refers to state common law fraud, common law fraud actions. When I asked you for examples of kinds of sports betting that aren't included within a swap, I guess I really only heard you say kind of player props, so I guess I can understand, I'm not saying you should need to apologize for this, if it's preempted, it's preempted, but I can understand why New Jersey thinks, man, you've sort of taken everything that we're accustomed to regulating, does that sort of make sense? I certainly understand their argument, but again, the key difference is we're not preventing them from regulating state sports books, what we're preventing them from regulating is conduct that states have not since 1974 regulated, which is trades on a DCM, and there's lots of other things that a state may well view as being gambling within the broad definition of gambling that many states, including New Jersey, have that I don't think, I do not believe it's subject to reasonable dispute, that even though a state may think it falls within their gambling statute, if it's on a DCM, it's off limits for the state, and the same thing is true here. And we think that that is a sensible result, and it's a result that's commanded by the text of the CEA, by the history of the CEA, by the deliberation that went into the decision to grant the CFTC exclusive jurisdiction over trading on designated contract markets while leaving it up to them. Your friend mentioned a couple of other congressional acts. I think one, he didn't say it specifically, but it was in the brief, Indian Gaming Regulatory Act, and the other one, Unlawful Internet Gambling Enforcement Act, and that that support his position. Maybe you could just reply to that. Sure. So, I'll take each in turn. As to IGRA, the Indian Gaming Regulatory Act, many of the other statutes that they refer to, none of those, they do broadly turn on state law, but none of them suggest that states have the authority to regulate gaming in the specific application here, which is in the application of trading on designated contract markets, and they don't define bet  They refer to bet or wager, right? Yes. They refer, but they don't define. Okay. The one statute, Chief Judge Chigars, that does define bet or wager is the UIGEA, which is the second statute you referred to, and that statute expressly carves out from the definition of bet or wager a trade that happens on a federally designated contract market, because of course, Congress has always understood that if it's on a designated contract market since 1974, it's not up to states to regulate it. It's up to the CFTC to regulate it, and as defendants themselves note, the UIGEA was enacted just four years before Dodd-Frank. So Dodd-Frank, you know, happens in the wake of the UIGEA, in the wake of Congress's recognition that this sort of conduct, even though broadly, you know, primarily, of course, it is still true that states primarily have the authority to regulate gaming, just not in the narrow application here. All right. Thank you. Thank you. Do you have anything else, Judge Porter? Judge Roth, do you have anything else? Nothing further. Thank you. Okay. Thank you. Thank you, counsel. We'll hear rebuttal. Thank you, Your Honor. Sure. I'd like to make five, hopefully, fairly brief points, two on swap and three on preemption. First on swap, I think, again, we heard from the other side, don't worry, nothing to see here. CFTC is just controlling what's on their designated contract markets. I've never heard an explanation of how that works with the statute. Section 2E makes it illegal for persons to trade swaps outside of designated contract markets. Section 6DA talks about how companies have to register in order to accept swaps. So our casinos are not registered, for example. And then 13A makes it a crime to trades, to willfully violate the Commodity Exchange Act. I have no idea what they're talking about when they say, don't worry, this can only be limited to designated contract markets. That's not how the statute works. On their point for limiting principles, on their view, I don't see any limiting principles. The ones that they've pointed to themselves are atextual. The idea that it has to have consequences out in the real world is true for literally everything as we point out in our brief and the attenuated examples they give. They don't even reference sporting events that themselves are doing something immediately economic. It's talking about a winning Super Bowl equals a parade, equals financial consequences. There's no end to that. And I think when you see that on their platform now, now they're putting on prop bets that are examples of a player catches a certain number of passes or the team score a certain number of points. I mean, if they're saying those things are linked to potential financial, economic, or commercial consequences, I have no idea what the limiting principle is. There's no limit on being beyond the control of the parties, by the way. That's in the definition of excluded commodity, not under the definition of swap. So that would come into play later in the process. So that's not a limiting principle. And then we talk about de minimis. That's also made up. So I just think there's no actual limit on what they would cover with their definition. And second, on the swap point, I, again, heard no answer to there's a text here. Congress could have been clearer either way. They could have said swaps are clearly sports bets are in or sports bets are out. But they didn't say that. And so we have to use the canons of statutory construction to figure out what the text means. No answer to the three clear statement rules that clearly point in our favor on this. Major questions, not altering the balance, and implied repeal. And I would point that out for your honors. On preemption, and I see my time is running short, on exclusive jurisdiction, we point this out in our brief, but exclusive jurisdiction was meant to separate the jurisdiction of the federal agencies. It wanted to give exclusive jurisdiction to the CFTC. And there's nothing that, if you do an actual field preemption analysis, there's no, we'll give you a little more time. It's okay. Go ahead. Okay, thank you, your honor. So I'll slow down a little bit. Okay. Exclusive jurisdiction was meant to separate out the jurisdiction from the CFTC and other federal agencies. It was not meant to preempt the field. Again, the Seventh Circuit said this in the American Agriculture case. And as we point out in our brief, really, if you're looking at a single statutory provision that's supposed to do some preemption, that's an express preemption argument. They're not arguing express preemption. Nobody has ever argued express preemption here. And we have this court in Farina rejecting field preemption where an agency, in that case, the FCC, had exclusive authority to do something. So it's not unprecedented. And when you look at the legislative history for this, you have, you know, legislators saying what we're really concerned about is field preemption. The language they use in the conference report that both parties cite is substantive state laws that are contrary to or inconsistent with federal law are preempted. That's classic conflict preemption. And so I think for those reasons, we would say no field preemption here. And I mentioned the lack of a comprehensive scheme. They don't even try to do that sort of classic field preemption analysis. This is not like in-air flight operations or nuclear power plants or anything like that. There's no comprehensive scheme. Kansas versus Garcia tells us these are rare cases of field preemption. This is not one of them. And then lastly, Your Honor, I would just say, I guess, two subsidiary points. But footnote 10 in our brief, we addressed their point that they can't take bets outside of New Jersey. Our laws are limited to New Jersey because we can't regulate outside of New Jersey. We're not saying you can only accept bets in New Jersey. That's not what our statute means. We've never taken that position. So that's- Wait, your statute doesn't say you have to physically be in New Jersey to- No, no, for New Jersey residents, you have to comply with our laws. But I think their point was where our laws are restricting them to only accepting bets in New Jersey, and that's not what it's doing. If they can accept bets outside of New Jersey in compliance with other state and federal laws- I thought they were saying, we can't tell if some bettor's in New Jersey or not. Well, maybe they're saying that. I didn't take them to be saying that. But if they are, I mean, there's ways to deal with that. There's geolocation technology. There's a company called Sport Trade that does exactly what Cal-SHE is doing in New Jersey right now and has a New Jersey gaming license. So there's ways to deal with those sorts of things. It's certainly not an obstacle or an impossibility when, as I said, federal law prohibits what they're doing and state law prohibits too. And the last thing I'll just say for your honors, this would, as the amicus briefs point out, and I pointed out in my opening with Congress not intending this to be the result, the CFTC does not regulate gaming. They are woefully inadequate to regulate gaming. And we see this in the CFTC's own notices in the Federal Register. And I would point your honors to 89 Fed Reg 48982, where they said, the Commodity Exchange Act and the commission regulations are focused on regulating financial instruments and markets and do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent in gaming. So this would be a massive sea change in how to regulate gaming. Again, if they're correct, all of it has to be on a CFTC-regulated exchange and would preempt all state laws. Our case is narrow. It's just about sports. It's not about anything else. But even in that, this is a massive billions and billions of dollar industry that they're upending with their theories here. So with that, I appreciate the court's indulgence in letting me go over time. And we would ask that the court reverse. Thank you. Thank you. Thank you, counsel. We'd ask that the parties order a transcript and split the cost of that, of this particular oral argument. We're going to take this case under advisement. It's an interesting case, really well litigated. And thank you, counsel, for your excellent briefing and arguments here today. And with that, we'll ask the